Good morning, Your Honors. If it pleases the Court, my name is Stephen Volker, appearing for Appellants, Pacific Coast Federation of Fishermen's Associations et al. With the Court's indulgence, I request three minutes of rebuttal. Just watch your clock. Yes, I will. Thank you. The District Court's ruling should be reversed for two primary reasons. The District Court failed to follow the Clean Water Act's express language, and this Court's careful ruling in PCFFA v. Glazer. The first primary error is that the District Court held that the originating source of a pollutant must be a point source in order to trigger the requirement for an NPDES permit under the Clean Water Act. This is an error. It's contrary to the statute, which contains no such expression of a limitation. Instead, the statute is pretty clear in describing the broad reach of the NPDES permit program to extend to any pollutant discharged to a water of the United States by any means that is a point source, which we have here. Second, it's contrary to the governing regulation, which appears in 40 CFR section 122.2b, which specifically clarifies that a point source includes the additions of pollutants into waters of the United States from surface runoff, which is collected or channeled by man, which is exactly what we have here. Third, the Court's ruling is contrary to this Court's careful explication of the governing law in Committee to Save McCallum River v. East Bay Mud, and also the Supreme Court's ruling in the Miccosukee case. Both make clear that the discharge of a pollutant from a source other than the point source itself, from an originating source that is a non-point source, triggers the NPDES permit requirement. So, counsel, I take your point. I think that's right as far as if this issue were about the points, you know, whether a permit is required. But this case is requiring us to examine the exemption for return flows from irrigated agriculture. So tell me why. How would that exemption work if it allowed for non-point source pollutions to come into the mix? Yes, well, I guess there are several steps to be taken. First, one looks at the statute. The statute's language requires that for the return flow from irrigated agriculture exemption to apply, the pollutants must be entirely from an agricultural source. It doesn't say mostly. So whereas here the pollutants discharged are not exclusively or entirely from agricultural originating sources, but instead are from other activities or uses, then the statutory exemption by its own terms doesn't apply. Right. So let me just lay it out. Entirely would mean it has to be entirely. We agree, and the prior panel found that. But if you include non-point source pollution, such as surface runoff and other things that don't come from a particular area, does that defeat this exemption? Because as I understand the other side's point of view, there is invariably some return flow that picks up non-source pollutants from rain, from, you know, from roads and freeways, from something else. So when would the agricultural exemption ever apply if the exemption were to allow non-point source pollution? Well, I guess I would take issue with all respect to some of the premises here, is that there is a certain degree of inevitability that other sources would insinuate themselves into the discharge process. And that may well be an argument addressed to Congress to revise the statutory limitation. But this Court's function is to construe the language as presented by Congress. And in this case, the word entirely, as this Court properly held in the Glaser case, means fully, completely. So let's take windblown dust. Is it possible not to have windblown dust? I can't answer that question, Your Honor. Well, your brief has identified that as one of these other sources. It has to be taken into account. Just as a matter of biology, physics, chemistry, it seems to me it's inevitable that things get blown around. And if you have a channel of water, some deposit into the water by the wind is inevitable. And so that's the question I think Judge Sanchez has posed. Would that make the agricultural exemption a dead letter? Because you can't keep absolutely everything else out from the flow of water. Well, to answer the question, there was evidence in the record that a certain portion of the pollutants in the San Luis drain was from the windblown dust. But that certainly was not the focus of the proof presented by plaintiffs, in this case, which identified many discrete geographically specific areas from which pollutants that did not originate in farm use were collected and channeled by the defendants for discharge through a point source. And we elaborated on those at some length. And those include the discharges from the non-farm lands adjacent to the drain. According to the two experts in the case, the vast majority of the lands adjacent to the drain were non-farm uses. We're here right now trying to focus on your argument that by limiting the district court's limitation of what to consider in terms of what's coming in only to point source deposits, so he's excluded the categories that don't come from a point source. And so we started with focusing on this windblown dust because it seems to me inevitable. And you can say, well, that's only a small fraction. But the broader question is the district court has decided if this agricultural exemption is to be interpreted broadly, as our previous panel said, the only practical way for it to have any impact would be to limit what gets considered. The limitation that was selected or imposed by the district court was to limit, was it incoming from point source or non-point source? To tell me there are lots of things other than dust really doesn't speak to the theoretical problem because the question is whether you can properly rule out the non-point source entry. And so that's where I'd like you to focus your attention. Why is it the district court was wrong in limiting what gets considered? For three reasons, Your Honor. First of all, the statute doesn't say mostly. It says entirely. Secondly- Well, that's the problem, though, because if it says entirely, then the dust kills it right there. It's all over. But that's plainly not what the exemption is intended to accomplish. So the question becomes entirely from what set do we consider? And the district court says we limit the consideration to the point source entries. So to tell me that the statute says entirely doesn't solve the ultimate problem. It helps to make the agricultural exemption a dead letter. So why else should we decide that- Yes, I'd be happy to answer that. The regulation makes clear that a point source remains a point source, in this case the drain, even if pollutants are added to that point source from non-point sources. Well, that raises the same problem, which is it focuses on the application of the Clean Water Act to begin with but doesn't interpret the extent of the exemption. I'm not telling you anything new. That's very much the argument that's been presented to us, but I'm not hearing a reason why we should interpret the exemption narrowly, as you appear to be arguing. Well, a long line of this Court's rulings have held that exemptions from the jurisdictional or permitting provisions of the Clean Water Act should be construed narrowly, not broadly. Except this Court has already said that we interpret this one broadly. Glazer says that. I would respectfully point out that this Court's ruling in Glazer was very careful to emphasize the meaning of entirely as being broadly applicable. Secondly, bear in mind that it would be a physical impossibility to have a point source discharging into another point source, and this is recognized in the EPA regulations and in a number of the cases, and the reason for that is simple, that by definition, a point source requires a discharge to waters of the United States. Once the discharge reaches those waters, it is dispersed in those national waters and is no longer under the control of the defendant. So concern about the perhaps inevitability that some windblown dust would contaminate almost any waste discharge stream should not be a factor in this Court's attention to what the statute says, what the regulation says, and the fact that there are cases pretty clearly on point, such as the McCallamy River case where non-point sources were collected by an agency and they became pollutants subject to the NPDES permit process because they were discharged to waters of the United States. And in this case, we identified four categories of pollutants that were a non-point source in nature but were contributing to the pollutants in the waste stream discharged by the drain. And most importantly, the defendant's own monitoring records, these are prepared by the San Francisco Estuary Institute on a monthly, quarterly, and annual basis, showed that up to 52% of the waste stream discharged by the drain to Mud Slough were from lands adjacent to the San Luis drain over its 28-mile length. And the experts agreed in this case that the majority of those lands were non-farm uses. Well, I don't think this argument should be confusion that this wouldn't be a problem. It's just a matter of who gets to regulate it. Because the issue here is, and the background principle is, that the Clean Water Act is meant to have federal regulation over point source discharges, and it left to the states to do the non-point source regulation by and large. And so it's not that this shouldn't be a regulated issue, but who should get to regulate it. And, you know, the wind dust or the dust blown from wind is one issue. What concerned me a little bit more was what you just raised, is that I can't really conceive of an agricultural zone that is not going to also have roads or freeways or even non-farm houses, just other activities, you know, human activity, that will invariably enter into return flows from irrigated agriculture. I just have a hard time seeing how that exemption would ever exist if we adopted the proposal that you're suggesting. I think that Congress wisely reserved to the permitting agency the discretion to determine how best to regulate the different waste streams that are commingled in a commingled discharge such as this one. And therefore, Congress, together with the EPA, have established a pretty broad on-ramp to the NPDES permit process. And once a discharge meets the criteria, which this clearly does, in fact, the defendants conceded it was a point source discharge requiring an NPDES permit back in 1996 when they applied for such a permit, conceding it was a point source. When that is the context, it then follows that rather than debating in this courtroom what waste streams that are commingled in that discharge should trigger some form of regulatory protection of the receiving waters, it falls to the agency that has the permitting authority. But it doesn't because there's also a statutory exemption that we have to apply. And so it doesn't fall to the agency to decide whether to apply that exemption or not. Congress has said the permitting process shall not apply in this particular context, and we're here having to decide what meaning to give to that. So respectfully, I'm not sure that it would just be, well, whatever the agency happens to say goes. Not as to the entryway decision. No, as to the application of the exemption itself. The application of the exemption is a threshold determination based on the statutory criteria. And in this case, the statutory criteria have been satisfied. There was a discharge of a pollutant from a point source to waters of the United States. Accepting your interpretation basically reads the agricultural exemption out of the statute. I pose that to you, and I haven't heard anything suggest otherwise, and we're supposed to interpret statutes so as not to make some part of it null. Actually, I beg to differ respectfully, Your Honor. I think this court did a pretty good job in PCFA versus Glacier in identifying the pathway the district court should follow, and that it's a threefold pathway or three-stepped. First is to determine whether there is a discharge containing pollutants from non-farm sources. We have a discharge that contains pollutants, and it's undisputed in the record that they are from non-farm sources. The second question is, are any of those sources of pollution properly subject to regulation under EPA's regulatory scheme? EPA makes clear that it makes no difference whether those pollutants are from a non-point source or from a point source. It matters only that they are discharged from a point source. In this case, we have a record that amply establishes, and this would be the third part of the process, amply establishes that we have at least four categories of substantial pollution. I'm confident we'll give you some time for rebuttal, but I want to focus specifically on the question I posed, which is what is there covered by the agricultural exemption based on the argument you've offered us as to how it should be applied? And my sense is there's nothing, because there's going to be something applying the entirely standard, as you argue, means there's always going to be something from the outside, which means there's nothing left to the exemption, because at the end of the drain, there is a point source, and you're going to say everything up to that time gets covered, even though it seems to be at least some of it from sources that would be covered by what the agricultural exemption intended. So my question is what impact do you think the agricultural exemption could possibly have based on your interpretation? Under these facts, the agricultural exemption would apply to the discharge from a point source which was entirely from irrigated agricultural uses. That seems to be a physical impossibility, which thus by itself would suggest, I'm still facing with the prospect that the agricultural exemption has zero practical impact. Could I maybe put a slight variation on Judge Clifton's question? I guess I understand. I don't really seem to see you arguing that it is possible for this, the drainage irrigation system at issue in this case, to completely screen out non-point sources, non-agricultural sources of pollution. But is it possible, or is it even in the record for us to consider whether it is possible to build an irrigation drainage system that would somehow be composed entirely of agricultural sources and exclude non-point sources that are non-agricultural? Do you understand what I'm saying? Like there's a question of what is possible and not possible in this case. But I think if it were possible to build this kind of drainage system, then this agricultural exception would still have some application. But I don't know if that's in the record. Well, I guess I would say from the perspective of strictly interpreting this under the governing statute and regulation that one does not change the interpretation of the plain language based on the facts that may arise in a particular case. The exception is the plain text is what it is, and we shouldn't take these things into account. But let's say, assume for the sake of argument that there's some ambiguity here or that we do need to consider whether this combined with the strict interpretation of entirely this not adopting the district court's interpretation would effectively eviscerate the exception. Well, the purpose of the Clean Water Act is to reduce pollution, and there are narrow exemptions, stormwater, agricultural return flows, some irrigated agriculture, and courts consistently construe those exceptions narrowly. Otherwise, the exception swallows the rule. As Judge Clifton has pointed out, there will always be some perhaps de minimis entryway for a pollutant to enter a waste stream, but that should not dissuade this court from following the letter and the intent of the law, which is to provide a broad on-ramp to permit regulation and then to turn over to the public review process that follows an agency's examination of what is properly considered to be outside the scope of the Clean Water Act because it's entirely return flows to irrigated agriculture and what is not. In this case, the evidence was pretty overwhelming that the four sources identified by plaintiffs were not from agriculture, one of them being the Vega Solar Project, which is an industrial use, another being the admittedly non-farm uses adjacent to the drain, which by the defendant's own monitoring reports yielded a waste discharge of 8,500 acre-feet annually, which is a quantity of polluted water equivalent to one square mile at the depth of nine feet. So we have a pretty strong record here, and we also have court rulings that make clear that this non-point source distinction drawn by the district court has no basis in the statute, has no basis in the regulation. Counsel, I'm sorry to interrupt. Can I ask you one final question? Sure. Does Glaser, one of the arguments that has been raised is that Glaser requires us to affirm the district court's view of this additional point source requirement because at the end of Glaser it says that the panel affirmed the district court's interpretation of discharges from irrigated agriculture to mean discharges from activities related to crop production, and discharges are defined in the Clean Water Act as a point source discharge. Do you agree? I assume you don't agree that Glaser binds us in some sort of way, but I'd like to hear your views as to why it does not. I don't believe that's a correct interpretation of Glaser. With all respect, Your Honor, Glaser, and we pointed out in our briefs, Glaser uses the term discharge or discharges or discharged 54 times. We reviewed each of those 54 examples. Not one could be reasonably interpreted to suggest that this court was using the term discharge to mean the very nuanced legal term discharge from a point source to waters of the United States. Not one of them. Instead, as we pointed out, the court's ruling uses the term discharge repeatedly in reference to what is clearly not a point source discharge. It refers to the discharge of underground pollutants, for example, which is never a point source, and it referred to other discharges that clearly were not of a point source nature. And for those reasons, a careful reading of Glaser actually supports plaintiffs because the court was very clear that although four of the sources of pollutants in this case were discharged through the drain's point source discharge to mud slough, not one of them necessarily would be excluded from MPDES permit regulation because the court avoided any implication that those sources of pollution, because they were passed through an agricultural drainage, if you will, should be excluded. Instead, the court went in the other direction following settled precedent that claims of exemption should be narrowly construed and made clear that those four claims should be reinstated, which they were, to allow plaintiffs to establish, and they did, that those four sources of pollution fell well within the MPDES permit requirement and were not sources from irrigated agriculture. And our briefs go to some length to explain that. I'll give you a minute on rebuttal. Thank you. Good morning, Your Honors, and may it please the Court. David Frankel on behalf of the federal defendants. I'll be splitting time today with the authority. Ms. Feber is here. We'll get eight minutes of the time. Just to set the background a little bit, this case involves naturally occurring pollutants in the soils of California's Central Valley that seep or drift into the Grassland Bypass Project's drainage system as a result of natural forces, things like passive groundwater flow, percolating rainwater, or wind. That's an unavoidable aspect of this project, and it would be an unavoidable aspect of almost any irrigation agricultural project, certainly any irrigated agricultural project of this size, and it doesn't affect the application of the Clean Water Act's exemption for agricultural return flows for two principal reasons. And so first, and this is what the Court was focusing on largely in Plaintiff's presentation, but when pollutants enter the drainage system here in the ways that plaintiffs have identified, they did so as non-point sources. That's undisputed. And because there is no permitting obligation that arises from non-point source pollution, the mixing of exempt return flows with exempt non-point source pollution doesn't give any trigger for NPDES permitting. All the flows are exempt, and therefore the combined flows are exempt. Well, if there weren't agricultural farm-related flows, then the Supreme Court would seem to be saying, and I always make a hash of it when I try to pronounce it, I think of Muskegee, but it's not that, but, you know, the Florida version of it, that says you look at where it enters the navigable waters, and there's no question here that it enters the navigable waters through a point source. So from that perspective, in terms of the initial application of the Clean Water Act, where it enters the navigable waters is what counts. So if it weren't for the farm exemption and the fact that some portion of this is from agricultural use, there wouldn't be much of an argument here today. Why is it you contend that the agricultural exemption and the portion that is agricultural is enough to make us say this isn't a case governed by the Supreme Court's precedent? Well, we agree. I mean, what the Supreme Court's precedent is concerned with is what you need to establish a prima facie case of liability, and that there is a discharge here that adds pollutants into waters of the United States, but that's just the top-level question. I mean, the second question is, then, how does the agricultural exemption apply? And what you have here is an entire system that is devoted and was constructed for the purpose of carrying agricultural return flows and bypassing sensitive ecosystems to get them past those and to discharge them in a safer place for the environment. But once you're in that world of the exemption, you need to work backwards, and you need to look at where these pollutants originated. And the exemption holds so long as you don't find an additional discharge looking upstream that would itself be subject to the NPDES permitting scheme. But here's where I think it's a little bit difficult with your argument, and this is adding to what Judge Clifton was bringing up with Mikosuke. Mikosuke said the point source doesn't itself have to be the source of the pollution. But what you are suggesting about the exemption is that we do need to go find an upstream point source that is a source of the pollution. So if that's the reading, then why doesn't that conflict with Mikosuke? Because Mikosuke, again, is only concerned with that prima facie case. It doesn't get into the world of once you're looking at the exemptions, whether the exemptions also apply at that point. But I think another way of looking at this is that you have the agricultural flow, which itself would be exempt, and then you look at the inflows into the agricultural system. And if those inflows into the agricultural system are themselves exempt, as they are if they're non-point sources, then ultimately what you have at the end of the day is agricultural pollution that just mix with these non-point sources that, frankly, are going to be unavoidable. But under your interpretation of the exception or the district court's interpretation would be, my understanding would be let's say agricultural land got retired, converted to industrial land, and they just leaked pollutants, toxins, into the ground that got into the irrigation system. They didn't have a point source, but they just let their pollution go. Yes. That would get into and that would the agricultural exception would still apply, even if that was 30 percent, 40, 60 percent of the majority of the discharge under your interpretation. I think that would apply, which would eviscerate our prior decision that the discharge has to be entirely agricultural. So I think that does not occur for the reason that when you have an industrial facility, the way that discharges occur is going to be through regulated NPDES point sources. Really, the reason you don't have any point sources here is because you have natural pollutants leached out of the soil that are carried by these natural forces. I'm sorry, I don't understand the answer to my question, because what if an industrial facility was just causing, I don't know, they had trucks going in and out, and they were causing a lot of just ground pollution that was seeping into the system, not through any point source. You would say under your exception, no matter what percentage of the discharge that was, this agricultural exception would apply. It's hard to engage with that hypothetical a little bit, but I'm going to do my best. I mean, I think it is very hard to imagine a situation where you have an industrial site that is leaching pollutants into the agricultural system and not doing so through a point source. I mean, a truck would be a point source. Really? A truck? Just the road traffic pollution? I mean, your whole argument is that's not a point source. Well, I mean, if we're talking about, you know, small fibers from the truck's tires that get released into the air, that's not a point source. But if the truck is leaking, if the truck is dropping, you know, industrial pollutants, I mean, if we're in the world of talking not just about, you know, the residue from tires that floats into the air and get captured by rainwater, but if we're in the universe where we're talking about things like the chemicals that are being used at an industrial facility, the way that would enter the agricultural system here would be through some sort of point source, and then it would be conveyed by the agricultural system, you know, into waters of the United States, and there would be liability. Yeah, I guess I have a lot. I mean, part of my struggle here is that on the one hand, we say, well, there's – you seem to be saying there's – we just have to assume that it's not possible for an irrigation system to ever have completely screened out non-point sources of pollution. On the other hand, you know, because – and then not – but if we don't adopt this interpretation, then we would be eviscerating the exception. But at the same time, I have a hard time saying if we don't – if we do adopt the district court's interpretation, we would be eviscerating our prior decision, which is that when Congress said entirely agricultural, they really meant entirely agricultural. Yeah. Yeah, I mean, I'll start with what this court said. I mean, I do think that, as Judge Sanchez, you know, alluded to the argument, I think our top-line argument is that this issue actually has already been settled, that the district court – I just asked a question. You asked the question, but I'll take the opportunity to follow up on that. I mean, the district court, in its initial opinion, used the phrase that do not contain additional discharges from activities unrelated to crop production. That was a quote from the legislative history. It derived from the legislative history. Which I read, and it's – there's not a lot of – I mean, it's not clear to me that they were really using discharge as the statutorily defined term of art there, and we never commented on that. This issue wasn't presented. So I have a hard time saying that we should turn, you know, a quote from a quote, you know, in the context of a decision where a completely different statutory interpretation question was actually now binding on us now. Yeah. I mean, I'm not sure I would categorize it as a completely different statutory interpretation. It was the test that was before the court. I understand it wasn't the focus. I mean, I do think discharge – it is true that as a matter of – in the context of the Clean Water Act, discharge requires a point source, but it's also just true as a matter of common language, that when you use the word discharge, you're contemplating an emission or a release from a discrete point, that you're not talking about things like passive flows of groundwater driven by, you know, seasonal changes in the water table, that you're not talking about percolating rainfall, that these things as a matter of common language aren't discharges. In the Pacific Coast, we said we have to start with the text, and I look at the text of the exception, and I don't see where it says that the entirely means entirely unless it – but only if it came from another point source. Like, I have to read into the statutory text something from the legislative history that didn't actually make it into the statutory text and that I'm not even sure necessarily requires, you know, was meant, intended by the speaker, you know, to incorporate the statutory definition. So, again, following the rules of statutory, you know, textual interpretation, you know, it seems to me that the plain language of the exception doesn't limit – doesn't say if the non-agricultural source of pollution is a non-point source, it doesn't count. I take that point. I mean, I think what I would say is that what the district court did was it applied really the only sensible way to interpret this scheme. But we've been told many times that we shouldn't consider, you know, policy to override the plain text of a statute. But as Judge Clifton said, I think the question is even if you look at the word entirely of what's set in a certain way. And I think our point is that when you have two separate exempt flows, combining them together doesn't give rise to an NPDES permit liability. And I think this is a really sensible way to interpret the statute because on the one hand, if there is something that independently creates NPDES liability, if there is an industrial site that even has a leaky truck that's leaking some industrial pollutant into the ground, that at that point, the entity cannot then claim the agricultural exemption from sources that would otherwise require these permits. But on the other hand — Could we construe that under the MAUI standard of a functional equivalent point source? So even if you had an industrial plant that didn't actually have a specific conveyance of some kind, could that still be subject to analysis of a point source because it's clearly not agricultural, but it might be a functional equivalent discharge? I do think MAUI is useful there. I mean, I think MAUI is useful that when you have some point source, even if it's not directly going into the agricultural system or the waters of the United States, you can have a functional equivalent. I think MAUI is actually a very useful frame for understanding how you can get NPDES permitting liability back to the origins and why it makes perfect sense here that there needs to be some sort of point source, a direct discharge or the functional equivalent of a direct discharge into the irrigation drainage system. And because, you know, I think something that came out in — So how would that apply to the Vegas Solar Project? I'm sorry, can you repeat? So the Vegas Solar Project is obviously not an agricultural use in the land. So you think the argument is that it's a non-point source. Would it be a functional equivalent? It could be. So, again, if there was something on the surface of the Vega parcel that was from a non-agricultural use and there was a discharge and that discharge made its way underground into the project drainage system here and ultimately entered water of the United States, we agree that that would mean that the exemption, you know, cannot just be plainly applied at the end here. We agree with that. I mean, I think our point about Vega is actually largely that the factual circumstances of this case clearly preclude that possibility, that it was not possible during the two years that Vega was operational after it was converted from an agricultural parcel, that it simply was not possible that anything hitting the surface of the Vega parcel could have percolated into the irrigation drainage system eight feet below. In addition, even if it did so, those waters would have been reused at the San Joaquin River Improvement Project and therefore would have come within the exemption separately because at that point it was fully operational and capable of handling all of the flows from Vega and from other parcels. But I do think Vega is a helpful counterpoint here because we are not up here trying to say that you can launder things that are harmful hazardous pollutants through the system. I mean, and I think this case gives a really great example. If you look at the pollution sources that are alleged to give rise to liability here, you have migrating groundwater flows. You have naturally percolating rainwater. I mean, you have dust and vegetation and soil drifting in from a surface canal. And if you read it, if you read the exemption to apply as plaintiffs suggest here, it would never apply. And not just in this circumstance. I think council admitted that essentially it would never apply. Well, would it be better than to rely on the sort of district court's broad interpretation of what is agriculture related as including things that are inevitable and necessary to the system? But I think that to me is a much stronger argument than saying it has to be a point source. I take that. I think in some ways these two arguments are complementary. I think they're sort of aimed at trying to create a limiting principle that fits with the exemption in a similar way. And so in some ways they cover it in similar ways. But there are two independent grounds, we think, for basically knocking out everything, with the possible exception of vega, which is a red herring. And one is the point source way. And the other is the idea that all of these sources of pollution are, even if they didn't have to come from a point source, would nonetheless be related to crop production. And that's an independent grounds for this Court to find that all of these sources don't give rise to liability in this circumstance. I think under that you would bear the burden of proving that it's essentially inevitable, that it's not really reasonably possible to screen out those non-point sources. I mean, well, we do bear the burden here. I wouldn't state that as the test. I mean, I would say the test is if it's something that is an inherent and unavoidable part of the irrigated agricultural process. If the infrastructure that is typically used to carry irrigated agricultural return flows, if this is just how it operates and it's necessarily part of it, then I think that covers it and is an independent grounds for finding the exemption met in this circumstance. And I think for all of the things that we've identified, it does meet that test here. I mean, groundwater here, seepage into the San Luis drain, for example, that's just an inherent and inevitable part of how a concrete-lined agricultural drain operates, that by necessity it has to have some level of permeability with the water table below because otherwise the pressure of groundwater would damage or destroy the drain. Sediment is another item that's raised as a potential pollution source. And when we're talking about sediment, what we're talking about is sediment that was redeposited on the bottom of the drain because it was carried as suspended solids in the return flow, which itself is exempt for that reason, or from the natural drifting of things alongside the drain, things like dust, vegetation, dirt, cattails, that, again, for any surface conveyance of agricultural flow, that is just going to be what is part of it. And, again, that is not to say that this is not regulated because there is a pretty strict and it has been increasingly stringent program of non-point source regulation here led by the state of California that, among other things, has imposed a set of best practices on management of that sedimentation. I guess the third category of things I'd mention is just the water that's captured by these underground tile drains. And in almost every situation, the water molecules that flow into these drains are going to be a mixture of irrigation waters, rainfall that fell on that agricultural parcel, rainfall that fell on a nearby parcel, groundwater that migrated from some up-gradient source, that in any instance, drains do not discriminate between the waters and they are fulfilling their essential purpose of preventing groundwater rise that would otherwise destroy the crop root zone with this salty water when they bring away that water no matter where that originated from. And in a situation where there's no allegation that there's some industrial source, some point source of non-industrial pollution that's leaching some hazardous chemical there, what we have is just natural pollution and they're performing their basic function. I'm happy to end there, which I think has covered my two main arguments. I think to the extent that there is anything left after application of those tests, we do have some fact-specific arguments about vega, which I went through, as well as the water transfers rule. If the court has any questions on those, I'm happy to answer. But otherwise, we'd ask the court to affirm. Thank you. Thank you. May it please the court. Julie Fieber, I represent the San Luis and Delta Mendoza Water Authority. And I think a lot of the evidence and the facts around the plaintiff's four sources have been covered here, so I'm going to avoid repeating that to the extent I can. The bottom line is we believe the defendants actually did come forward and meet the burden set by this court in the 2019 opinion. We presented extensive expert evidence establishing that none of these four sources is anything beyond something that is inherent to crop production, something that simply doesn't exist, or a non-point source that is inevitably going to migrate, as groundwater will over time from the upstream to the downstream down into the rivers. It's inherent and inevitable portion of having an agricultural drain system. I mean, I'm a little uneasy with the inevitable. I mean, talk about even more attenuated from the statutory text, because we're not even talking about return flows from irrigated agriculture. Now there's an additional layer of, well, here you have a drain system, and now it's supportive of the drain system itself. Here's my question. What about roads, freeways, other things that are along the drain, non-farm homes? How are those inevitably part of agriculture in your view? Well, there's two distinctions, or a distinction that should be made. Along the drain, we're not really talking about roads, residences, things along that. That's where we had experts go out, and they categorized the land. And everything that's along that 28-mile drain, it's either retired or fallowed farmland, agricultural pasture land, or managed wetlands where they're feeding waterfowl. Up in the grassland drainage area, it's 94,000 acres. There are going to be roads. There are going to be residences. There may be farmhouses. But the reality is that any tile drain system, this is how irrigated agriculture works. You're going to have tile drain systems. They're underground. They're taking the adjacent groundwater. They're moving it into agricultural canals. There's inevitably going to be exchanges with groundwater. You can't, expert Berta actually went through and stated, there's no way to trace where every molecule of water in those tile drains comes from. Generally speaking, it comes from the upland. It flows downland. It eventually reaches the river. That's the way it's always been. It's a passive flow. The key point, however, for this case is that everyone agrees all of the area in the grassland drainage area was originally irrigated farmland. There are no industrial sources there. There are no point sources there. There is no collecting or channeling of groundwaters into the tile drain system happening there. All of the things that made cases like the McColumney case where you had an actionable NPDES liability are not existing here. This is just the only way you can have a tile drain system is by having it in the ground where inevitably it's collecting groundwater. But you're not arguing that if you threw in a tire factory or a cement factory and those groundwater sources mixed in with a tile drain system, that that would still necessarily be part of the agricultural system. Absolutely not. If there was a cement factory or if the Vegas Solar Facility actually did produce discharges that percolated down the 8 feet to the tile drains and made it out eventually to the drain, we'd have a very different case there and a very hard argument to be made. What if they did have non-point source pollution from a Vegas solar project that was getting into the system? If there was, and we demonstrated numerically, actually, there wasn't. I understand you're saying it's not happening. If it was. Hypothetically, if there was non-point source industrial pollution from the Vegas solar project getting into the drainage system, would the exception apply? I think here you've got the additional complication that everything collected in the grassland drainage area tile drains from 2011 on was being reused to irrigate salt-tolerant crops in the San Joaquin River Improvement Project before it went into the drain and made it to the water of the United States. So I think the exemption would still apply because all we're talking about that's going into the drain during the relevant time period is still irrigation return flows. Now, if you had a Vega facility that was pumping poison, it's pumping cyanide into the ground, A, you probably wouldn't be using it to irrigate almond trees because it would kill them, but obviously that would be a very different case. Well, I think under my hypothetical, the Vega source has not literally got a drain pumping into the drainage system, but it is – because of rain, pollutants on the solar panels are getting into the ground, right? So they're not coming – I don't know if this is – but I'm just making something up. Hypothetically, there is a non-point source, but industrial pollution coming from the Vega solar project getting into the drainage system and then being pumped through the project into the, you know, navigable waters. You're saying that the agricultural exception would still apply even if that was 20% of what was being discharged was coming from the solar project. The issue then becomes it's still going to be reused to irrigate the almond trees in the San Joaquin River Improvement Project. So from 2011 on, that's still going to be irrigation return flows going into the San Luis drain. So you're saying just because it becomes part of the system that those pollutants would still count as agricultural? If you're reusing it for irrigation. And this happens a lot with all the water collected in the tile drain systems. A lot of times it gets reused again and again to irrigate the fields. And those reuses do put it back within the statutory language in irrigation return flow. That's what the statute says. So obviously we're talking about a hypothetical here, so you kind of have to go back to the language of the statute. That says an irrigation return flow is exempt. But, you know, I think we would all agree it's very different if the Vega solar facility was actually a Vega cyanide facility. I hear you saying that just because as a practical matter no one would let that happen. Well, yeah, it would be hard to use it for irrigation again. At some point water would be so contaminated it could never be irrigation water. But that's not what we're talking here. This is passive accretion of groundwater. It's inevitable to the system. And, you know, the whole intent of this statute, again, was to level the playing field between farmers who irrigate, as we do in California, and farmers who don't. I guess what I don't understand is why if the 20% is coming from a point source versus a non-point source should make a difference in my hypothetical, right? Because under your interpretation, what I think you're just telling me is that even if it came from a point source it could come in under an exception because it becomes part of the irrigation system. If it got pumped back into reused agricultural land, even if it did come from a point source, it would then come under the exception. If all the water that's used for irrigation in the grassland drainage area is pumped in from somewhere else, you know, in a sense that would be a point source. In a sense that's what happens. It comes from the Central Valley Project. So water is coming in from somewhere. It's being used for irrigation. The fact that it's being used for irrigation inevitably means then you have to take away the surface return flows. I guess I maybe want to put a finer point on my question. In my hypothetical, let's change it to the Vegas Solar Project is pumping pollution through a point source into the tile drains. But then that water, polluted water now, gets used to irrigate farmland and then gets put back into the system. My understanding of your interpretation is because it has essentially gone through and been used to irrigate farmland, it now becomes agriculture related and it doesn't matter how much was point source discharged from the Vegas Solar Project. That would seem to be what the statute is saying. Okay. It's entirely irrigated return flows once it gets used for irrigation. I'm not hearing the government say that. And that seems a bit of a reach. So you can put a cement factory with a point source discharge, an upstream point source discharge, and it's polluting into it just by virtue of the fact that its pollution is mixing with the return flows. It's still exempt? I mean, now you're swinging to the complete other opposite side of everything under the sun can be part of the exemption, which, as counsel rightly pointed out, the exemption has to be narrowly tailored. I think you're within the realm of the County of Maui case at that point. You'd be having to go through and do an analysis under the multifactor test set in that case. But that's not what the district court is saying. The district court is saying is if there is an upstream point source discharge that is not agricultural related, it would not be subject to the exemption. But you seem to be wanting to throw in everything into it just by virtue of the fact that it's flowing into the agricultural return flows, which seems to defeat the purpose of the exemption in my mind. Well, our argument is that there is nothing coming off the Vegas solar facility. So this is kind of not part of the facts for this case. And there is no point source. The only thing that's remotely like a point source would be the Vegas solar facility. And then there is the additional situation here where water coming out of the grassland drainage area, tile drains, does get reused for irrigation. But we're not talking about a case where we have a cement plant upstream. I do think that would be a County of Maui case. You'd have to actually figure out is there the functional equivalent of a point source if you go and look where the poison coming off of the cement plant goes. But that's simply not what we're dealing with here. This is a purely agricultural project, and we're talking about purely agricultural return flows in stormwater that is eventually reaching the drain and then going out to the waters of the U.S. I mean, all these cases where we're counting that case, I think was also not interpreting the agricultural exception, correct? Correct. So, I mean, I think we have this world universe of cases that are interpreting this act, not just interpreting the exception that we are saying inform our understanding of how to apply this. So I just want to be clear because I think I sometimes hear, you know, counsel for defendants arguing, well, all those cases just have nothing to do with how to interpret the agricultural exception. But I have a hard time just ignoring them as part of the statutory context. I think there can be factual situations where they're going to be coming in. I mean, if plaintiff, for example, had started from the beginning saying this is an indirect source that we're talking about. Now, plaintiff's four sources, they're alleging these are direct sources. But if we'd started this case with the posture that we had an indirect source, then I think we would have been looking at County of Maui or cases of that, and it would have been more controlling. But the facts here are not that. The facts here are it's an agricultural system. Thank you. Thank you. If it pleases the court, I'd like to respond to five things by opposing counsel. First, it was suggested that the San Luis drain inevitably will discharge pollutants from non-agricultural sources, and therefore the entirety of the drain should be exempted. I'd like to draw the court's attention to the direct rebuttal of that found in this court's ruling in Northwest Environmental Defense Center v. Brown 640 F3rd at 1072, where the court noted that that had been a proposal before Congress. Congressman Roncalio proposed an amendment which would have specifically exempted the San Luis drain from the MBDS permit process, and that was rejected on the floor of the House. So there should be no lingering suggestion that that was within the ambit of what Congress intended. Secondly, we strongly disagree with the suggestion that all of this land was always used for irrigated agriculture, and therefore you can lump it all together. The defendants admit, their own expert admitted, that most of the land adjacent to the San Luis drain that was responsible for selenium and other pollutants entering the drain was managed wetlands. Managed wetlands were never used for irrigated agriculture. These are either managed privately or publicly as wildlife refuges and such, but they are not irrigated agriculture. And one might ask, well, why did Congress deem it appropriate to regulate those discharges? And the reason is simple. It chose to regulate the discharges at the point of discharge to waters of the United States. That's always been the approach to the Clean Water Act, is you focus on the discharge point that's controlled by the discharger and then measure the pollutants there and then try to figure out how best to reduce those pollutants. In this case, had an MBDS permit been issued, the first question to be asked was, why do you have poor maintenance of the drain? As we explained in our briefs, there were many sections which had collapsed walls, allowing poisonous selenium water to enter the drain directly. Why do you have massive cracks in the walls? And then more directly to the point of maintenance is, why did the defendants fail to expand the San Joaquin River Improvement Project, which was the specific treatment proposal proposed for 20 years to make sure that a selenium-contaminated runoff from this project did not enter waters of the United States? And we find instead that there was a decision point many years ago, but during the period operative in this case... You have limited time, so can you make your other three points? You said you had five. I'm going to give you a little time, if you can quickly get through them. Okay. Thank you very much. I'm sorry, I went over. There was a suggestion that Maui supports the defendants. Actually, it's just the reverse. Maui is a good example of where this court initially, and then later in the U.S. Supreme Court, the court read the Clean Water Act's requirement for an NPTES permit broadly to assure that even where, as in this case, the discharge was not a typical direct discharge to a water of the U.S., but instead was the functional equivalent of that. So that should be read in favor of the plaintiff's approach. Then finally, we have throughout the argument today this disquieting suggestion that a point source doesn't require discharge to water of the U.S. There is no such thing in the Clean Water Act's regulatory regime that suggests that a point source can exist separate and independently from the ultimate point at which a pollutant enters waters of the United States. And there's a lot of cases. Look at Sierra Club Union Oil and many others that make that pretty clear. So I would urge the court to rethink what the purpose of the act is. It's to reduce pollution. The defense position here would thwart that by excluding NPTES permit regulation altogether from what is a crisis for the wildlife and the fish in the San Joaquin River. Thank you very much. Thank you, Counsel. Thank you all for your helpful arguments. This matter is submitted and we are adjourned for the day.
judges: CLIFTON, SUNG, SANCHEZ